UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

**JOHN DEERE DEFERRED SAVINGS PLAN
FOR WAGE EMPLOYEES and DEERE & CO.,**

        **Plaintiffs,**

        v.                                 Case No. 06-C-1235

**ESTATE OF ALAN R. PROPST,
RENEE J. PROPST,
DIANE M. REGER,
JULIE M. MAAS,
SHIRLEY WARMKA,
GARY L. PROPST, and
DONALD G. PROPST,**

        **Defendants.**

---

## DECISION AND ORDER

In this interpleader action initiated by John Deere Tax Deferred Savings Plan for Wage employees and Deere & Company on November 19, 2006, the substantive dispute is between the defendants, Diane Reger, Julie Maas, Shirley Warmka, Gary Propst, Donald Propst and the Estate of Alan Propst, referred to here as the Estate, and Renee Propst and involves the question of who is entitled to the proceeds of Alan Propst's 401(k) account.

On January 5, 2007, the Estate filed an answer and crossclaimed against Renee Propst, alleging breach of contract, equitable estoppel, breach of duty of good faith, and breach of fiduciary duty. (Docket No. 12 at 2-3.) On January 19, 2007, Renee Propst filed an answer to the crossclaim, (Docket No. 22), and an answer to the complaint and a counterclaim against the plaintiffs seeking to recover benefits allegedly wrongfully withheld, (Docket No. 21). Pursuant to a stipulation between

the parties, the court dismissed Renee Propst's counterclaim on February 13, 2007. (Docket Nos. 26, 28.)

Following a period for discovery, on September 3, 2007, Renee Propst filed a motion for summary judgment, (Docket No. 40, 41), to which the Estate defendants responded, (Docket No. 52), and Renee Propst replied, (Docket No. 58). The plaintiffs also submitted a response to Renee Propst's motion limited to the issue of attorneys' fees. (Docket No. 55.)

On September 4, 2007, the plaintiffs filed a motion to be dismissed from this action and for attorneys' fees. (Docket No. 43, 44.) Renee Propst and the Estate defendants responded, (Docket Nos. 46, 47, 48), and the plaintiffs replied, (Docket No. 49).

The pleadings on these motions are closed and the matters are ready for resolution. All parties have consented to the full jurisdiction of a magistrate judge. (Docket Nos. 6, 9, 11.)

**FACTS**

On March 13, 2000, Alan Propst executed a beneficiary designation form naming persons other than Renee Propst as the beneficiary of the proceeds in his 401(k) account. (Docket No. 40-4, ¶10; Compl. Ex. B, Docket No. 1-3.) Renee Propst and Alan Propst were married on March 4, 2005. (Compl. Ex. E, Docket No. 1-6.) Renee Propst was the spouse of Alan Propst at the time of his death. (Renee Propst Proposed Finding of Fact, Docket No. 40-4, ¶1.) Prior to their marriage, on February 25, 2005, Renee Propst and Alan Propst signed a prenuptial agreement ("the Agreement"), which was received as Exhibit E to the complaint. (Docket No. 40-4, ¶9; Compl. Ex. E, Docket No. 1-6.)

One of the parties' stated purposes in entering the Agreement was to "contract with each other concerning matters of the disposition of their Separate Property in the event of death or divorce." (Docket No. 1-6.) In the Agreement, the parties agreed to keep separate all property either possessed prior to the marriage or individually acquired during the marriage, and each party agreed

to waive his or her right to the other's separate property. (Docket No. 1-6.) As part of the Agreement, the parties disclosed their respective assets. Under the section designating "Retirement Interests," Alan Propst listed five accounts, and in the corresponding space captioned "Designated Beneficiary," names other than Renee Propst are listed. If the 401(k) account at issue is one of the accounts listed, it is not denominated as such.

On December 6, 2005, Alan Propst filed a request for a harassment restraining order against Renee Propst, wherein he alleged that Renee Propst engaged in a variety "bizarre" behaviors. (Compl. Ex. C, Docket No. 1-4.) In this request for a restraining order, Alan Propst stated that "[t]he marriage was, in substantial part, a marriage of convenience due to Renee Jo's inability to acquire health insurance so as to deal with her medical condition, primarily the liver disease from which she is suffering." (Docket No. 1-4.) Alan Propst and Renee Propst began living in June of 2005, despite the fact that Renee Propst still maintained her own residence. (Docket No. 1-4.) Alan Propst described numerous incidents in which Renee Propst allegedly caused a disturbance outside the house, repeatedly prevented Alan Propst from leaving the residence, at times climbing on his truck or taking his boots, threatened him with a stool, repeatedly kicked him, and knocked him down. (Docket No. 1-4.)

On December 12, 2005, the Dodge County Circuit Court granted Alan Propst a one-year restraining order against Renee Propst. (Docket No. 1-4.) On February 8, 2006, Alan Propst filed a petition for divorce from Renee Propst in Dodge County Circuit Court. (Compl. Ex. D, Docket No. 1-5.)

In response to Alan Propst's inquiries as to what effect his marriage to Renee Propst would have upon his beneficiary designation, plaintiffs informed Alan Propst that Renee Propst would receive the proceeds of his 401(k) account upon his death unless the plaintiffs received a Beneficiary Designation Form signed by Renee Propst wherein she waived her right to receive this

benefit. (Docket No. 40-4, ¶2; Compl. ¶20, Docket No. 1.) Alan Propst did not submit a new Beneficiary Designation Form. (Docket No. 40-4, ¶3.)

On August 16, 2006, Alan Propst died from injuries sustained in a motorcycle accident. (Compl. ¶22, Docket No. 1.) Upon Alan Propst's death, the plaintiffs initially determined that Renee Propst was the proper beneficiary and informed her that the plan funds would be distributed to her, but after being contacted by the Estate, stopped her access to the plan funds and initiated this action. (Docket No. 40-4, ¶¶11-14.)

**SUMMARY JUDGMENT STANDARD**

A motion for summary judgment will be granted when there are no genuine issues as to material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). As provided under Rule 56(c), only "genuine" issues of "material" fact will defeat an otherwise "proper" motion for summary judgment. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Material facts are those facts which, under the governing substantive law, might affect the outcome of the suit. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute of such material facts is "genuine" if the evidence is such that a reasonable trier of fact could find in favor of the nonmoving party. Id.

The movant bears the burden to establish that there is no genuine issue of material fact and that he or she is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Adickes v. S.H. Kress & Co., 398 U.S. 144, 159 (1970); see also Celotex Corp., 477 U.S. at 323. The moving party satisfies its burden by demonstrating "that there is an absence of evidence to support the nonmoving party's case." Celotex Corp., 477 U.S. at 325. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. Anderson, 477 U.S. at 255; Cain v. Lane, 857 F.2d 1139, 1142 (7th Cir. 1988); Spring v. Sheboygan Area School Dist., 865 F.2d 883, 886 (7th Cir. 1989).

Further, "on summary judgment, a court can neither make a credibility determination nor choose between competing interests." Sarsha v. Sears, Roebuck & Co., 3 F.3d 1035, 1041 (7th Cir. 1993).

If the moving party meets its burden, the nonmoving party then has the burden to present specific facts showing that there is a genuine issue of material fact. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).

**ANALYSIS**

Under the Employee Retirement Income Security Act ("ERISA") a spouse may waive her right to benefits under a covered plan only if

> (i) the spouse of the participant consents in writing to such election, (ii) such election designates a beneficiary (or a form of benefits) which may not be changed without spousal consent . . ., and (iii) the spouse's consent acknowledges the effect of such election and is witnessed by a plan representative or a notary public.

29 U.S.C. § 1055(c)(2)(A); see also Pedro Enters., Inc. v. Perdue, 998 F.2d 491, 494 (7th Cir. 1993). Based on the language of the statute, a spouse's interest in plan benefits may be waived only by the participant's "spouse." Thus, any provisions of antenuptial agreements are insufficient to waive the spouse's rights because, by definition, parties to an antenuptial agreement are not spouses at the time the agreement is signed.

Many courts have discussed this basic concept of requiring the parties to be spouses. In Richards v. Richards, 167 Misc. 2d 392 (N.Y. Misc. 1995), aff'd 232 A.D.2d 303 (N.Y. App. Div. 1996), a decision by a New York trial court in a divorce case, the court held that the antenuptial agreement wherein the parties agreed to waive any interest in the other's pension, and did so by repeatedly referring to various provisions of ERISA and agreed to execute all other documents necessary to effect the intent of the agreement, was nonetheless insufficient to constitute a waiver under ERISA. Id. at 392-95. Relying in part upon Hurwitz v. Sher, 982 F.2d 778, 779 (2d Cir. 1992), the court held that any prenuptial agreement, although otherwise consistent with the waiver

requirements set forth § 1055(c)(2)(A), was insufficient because the wife was not a "spouse" at the time the agreement was signed. Id. at 394-95.

The Fourth Circuit also concluded that any antenuptial agreement is insufficient to waive a spouse's rights under ERISA because the parties were not "spouses" at the time the agreement was signed. Hagwood v. Newton, 282 F.3d 285, 289 (4th Cir. 2002). The court noted:

> The spousal rights conferred by § 1055(a) were intended to "ensure a stream of income to surviving spouses," Boggs [v. Boggs], 520 U.S. [833,] 843 [(1997)], and the formalities required in § 1055(c) are included to protect against the risks of a spouse's unwitting waiver of those rights, Lasche v. George W. Lasche Basic Profit Sharing Plan, 111 F.3d 863, 867 (11th Cir. 1997) (noting that formalities are necessary "to ensure a valid waiver of a spouse's retirement plan [and] are consistent with the legislative policy of protecting spousal rights"). ERISA's formalities must, therefore, be strictly enforced. In Lasche, for example, the court held that a waiver was invalid under § 1055 simply because the signatures had not been witnessed by a notary as required by that section. Id.

Hagwood, 282 F.3d at 290.

The Fourth Circuit continued and stated:

Our conclusion that a premarital agreement cannot serve as a valid waiver of spousal rights as required by 29 U.S.C. § 1055(c) is further confirmed by the Internal Revenue Service's ("IRS") similar conclusion with respect to the identical requirements in the Internal Revenue Code provisions of ERISA. With the adoption of ERISA, Congress enacted mirror-image counterparts for the Internal Revenue Code to encourage employers, through tax benefits, to establish qualifying pension plans. See Gillis v. Hoechst Celanese Corp., 4 F.3d 1137, 1144-45 & 1144 n.6 (3d Cir. 1993). Thus, the provisions of 29 U.S.C. § 1055(c) are repeated *in haec verba* in 26 U.S.C. § 417(a), and the Secretary of the Treasury adopted regulations interpreting § 417(a). Those regulations include the following interpretation:

> Question 28: Does consent contained in an antenuptial agreement or similar contract entered into prior to marriage satisfy the consent requirements of sections 401(a)(11) and 417?
>
> Answer 28: No. An agreement entered into prior to marriage does not satisfy the applicable consent requirements, even if the agreement is executed within the applicable election period.

Treasury Regulation § 1.401(a)-20. Because the IRS is an agency "entrusted to administer" the tax counterpart of ERISA, we defer to its interpretation of 26 U.S.C. § 417(a). See Chevron, U.S.A., Inc. v. Nat'l Res. Def. Council, Inc., 467 U.S. 837,

844 (1983); see also Hurwitz v. Sher, 982 F.2d 778, 782 (2d Cir. 1992) (applying Treasury Regulation §1.401(a)-20 to support a conclusion that premarital agreement did not waive spousal benefits under § 205 of ERISA).

Hagwood, 282 F.3d at 290.

Numerous other federal courts have similarly held that an antenuptial agreement is insufficient to waive a spouse's rights under ERISA. See, e.g., National Auto. Dealers & Assocs. Retirement Trust v. Arbeitman, 89 F.3d 496, 502 (8th Cir. 1996) (holding antenuptial agreement insufficient to waive spouse's rights under ERISA, in part, because it was signed prior to the marriage); Neidich v. Estate of Neidich, 222 F. Supp. 2d 357, 366 n.3 (S.D.N.Y. 2002) ("[Antenuptial agreements] do not effectively waive a spouse's claims to spousal death benefits under an ERISA-governed plan.") (dicta); Ford Motor Co. v. Ross, 129 F. Supp. 2d 1070, 1071 (E.D. Mich. 2001) (holding that "premarital agreement cannot be used to circumvent ERISA's spousal waiver requirements"); Kowal v. Roberts, 1995 U.S. Dist. LEXIS 6506, 3 (E.D. Va. 1995) ("[T]he court concludes that the antenuptial agreement provisions are insufficient under ERISA to establish a waiver which overrides ERISA's provisions."); Zinn v. Donaldson Co., 799 F. Supp. 69, 73 (D. Minn. 1992) (holding the antenuptial agreement insufficient to waive spouse's rights under ERISA because it was executed prior to the marriage); Nellis v. Boeing Co., 1992 U.S. Dist. LEXIS 8510, 11 (D. Kan. 1992) (same).

The case of In re Estate of Hopkins, 214 Ill. App. 3d 427, 574 N.E.2d 230, 158 Ill. Dec. 436 (1991), is frequently cited, including by the Estate defendants, as the only reported case wherein a court held that an antenuptial agreement did act as an effective waiver under ERISA. See, e.g., Hagwood, 282 F.3d at 291; Richards, 167 Misc. 2d at 395; Hurwitz, 982 F.2d at 783; (Docket No. 52 at 7). However, in discussing this case, courts have repeatedly noted that the court's decision in Hopkins rested upon an erroneous reading of the Seventh Circuit's decision in Fox Valley &

Vicinity Constr. Workers Pension Fund v. Brown, 897 F.2d 275, 278 (7th Cir. 1990). As the Second Circuit explained in Hurwitz,

> The Hopkins court read Fox Valley to hold that "a surviving spouse can waive her interests in a plan under the REA without following [the] specific waiver requirements [of ERISA as amended in 1984]." Hopkins, 574 N.E.2d at 235. Fox Valley, however, addressed the question of whether a divorced spouse who was designated as a beneficiary prior to divorce may still receive death benefits despite a waiver provision in a divorce settlement. Fox Valley, 897 F.2d at 278. A divorced spouse, unlike a current spouse, is not protected by the explicit terms of the statute. The Seventh Circuit held therefore that a divorced spouse may waive benefits without following the explicit requirements of the statute. The Hopkins court erred by applying the same logic to current spouses. In reaching its decision, the Illinois court failed to consider the explicit requirements of ERISA with respect to spousal waivers. Moreover, the court in Hopkins disregarded the Treasury Regulations as merely "interpretive" and not binding. As noted above, these Regulations must be accorded some deference and may not be dismissed outright. See Bingler v. Johnson, 394 U.S. 741, 749-50 (1969).

Hurwitz, 982 F.2d at 783; see also, Nellis, 1992 U.S. Dist. LEXIS 8510, 8 ("Hopkins was erroneously decided."). Therefore, the court finds Hopkins to be of no legal significance to the issues presented in this case.

Aside from Hopkins, the court has not been unable to locate any case wherein a court held an antenuptial agreement was sufficient to waive a surviving spouse's rights under ERISA. There are, however, cases holding that upon divorce, an antenuptial agreement will be given its intended effect to waive a spouse's rights to benefits in a plan covered under ERISA. See, e.g., Savage-Keough v. Keough, 373 N.J. Super. 198, 861 A.2d 131 (2004); Critchell v. Critchell, 746 A.2d 282 (D.C. 2000); Ryan v. Ryan, 659 N.E.2d 1088 (Ind. Ct. App. 1995).

In Critchell, the D.C. Court of Appeals held that ERISA's explicit waiver provisions apply only to claims for survivor benefits and stated that ERISA "is purposefully silent and does not demand the same safeguards for former spouses." 746 A.2d at 286. Thus, the court held that ERISA did not preempt state marital property law, and it was state law that must determine whether the

antenuptial agreement should be given its desired effect. Id. at 286-87. However, this distinction between the effect of an antenuptial agreement in the divorce context versus one in which survivor benefits are at issue is not universally accepted. See, e.g., Richards, 167 Misc. 2d 392.

Even assuming divorce law favoring application of waiver, in the present case, the parties were merely in the process of getting divorced. The Estate argues that while this divorce action was pending, Alan Propst and Renee Propst were legally separated, and thus Renee Propst's formal waiver of her rights was not required.

The relevant Treasury Regulation states:

Q-27: Are there circumstances when spousal consent to a participant's election to waive the QJSA or the QPSA is not required?

A-27: Yes. If it is established to the satisfaction of a plan representative that there is no spouse or that the spouse cannot be located, spousal consent to waive the QJSA or the QPSA is not required. If the spouse is legally incompetnent (sic) to give consent, the spouse's legal guardian, even if the guardian is the participant, may give consent. Also, if the participant *is legally separated* or the participant has been abandoned (within the meaning of local law) *and the participant has a court order to such effect*, spousal consent is not required unless a QDRO provides otherwise. Similar rules apply to a plan subject to the requirements of section 401(a)(11)(B)(iii)(I).

26 CFR § 1.401(a)-20 (emphasis added).

Renee Propst responds by pointing out that Wisconsin recognizes a cause of action for legal separation, see Wis. Stat. §§ 767.315-35, but Alan Propst elected not to pursue it. (Docket No. 58 at 2.) Under Wisconsin law, the requirements for and effects of a legal separation are largely identical to those for a divorce, except that a judgment of legal separation may be revoked upon the reconciliation of the parties. Wis. Stat. § 767.35(4). There is no evidence to suggest that Alan Propst had received a court order of legal separation prior to his death. The fact that Alan Propst had obtained a restraining order against Renee Propst, the parties were living separately, and a

divorce action was pending, is insufficient to constitute a legal separation under Wisconsin law, and thus does not constitute a legal separation under 26 C.F.R. § 1.401(a)-20.

Returning to the statutory requirements for waiver, in addition to the fact that Renee and Alan Propst were not married at the time the antenuptial agreement was signed, this antenuptial agreement is insufficient to waive Renee Propst's rights to the plan benefits because it was not notarized or witnessed by a plan representative, see 29 U.S.C. § 1055(c)(2)(A)(iii), did not acknowledge the effect of such a waiver, id., and the antenuptial agreement did not clearly designate a beneficiary, see 29 U.S.C. § 1055(c)(2)(A)(ii). See also, e.g., Lasche v. George W. Lasche Basic Retirement Plan, 870 F. Supp. 336 (S.D. Fla. 1994) (holding antenuptial agreement insufficient to waive spouse's rights under ERISA because it failed to describe or explain the right the spouse was giving up and was not witnessed by a plan representative or a notary public).

With respect to the designation of a beneficiary, although the antenuptial agreement identifies certain "Retirement Interests" it is unclear which, if any, of the five accounts listed is Alan Propst's 401(k) account. (Compl. Ex. D, Docket No. 1-6 at 15.) None of the accounts is so designated. (Compl. Ex. D, Docket No. 1-6 at 15.) Renee Propst, under the name Renee Jo Petroselli, is the designated as the beneficiary of one of these retirement accounts. (Compl. Ex. D, Docket No. 1-6 at 15.) Persons other than Renee Propst are listed under the column "Designated Beneficiary" with respect to all the other retirement accounts. (Compl. Ex. D, Docket No. 1-6 at 15.) "John Deere" is referred to only under the heading "Life Insurance," and "Renee Jo Petroselli" is listed as the designated beneficiary of this policy. (Compl. Ex. D, Docket No. 1-6 at 15.) Thus, the antenuptial agreement does not clearly designate a beneficiary for the proceeds of Alan Propst's 401(k) account. Similarly, in failing to explicitly identify Alan Propst's 401(k) account, the antenuptial agreement cannot serve as a "knowing and considered" waiver of Renee Propst's rights, as is required by 29 U.S.C. § 1055(c)(2)(A)(iii). See Pedro Enters., 998 F.2d at 494.

Thus, the court finds that the fact that the antenuptial agreement fails to comply with 29 U.S.C. § 1055(c)(2)(A)(ii) and (iii) are additional reasons why the antenuptial agreement cannot act as a waiver of Renee Propst's rights to the proceeds of Alan Propst's 401(k) account.

The Estate's final argument is that the antenuptial agreement acts as a contract that bars Renee Propst from retaining any benefits she may receive from Alan Propst's 401(k). Section 1144(a) states that ERISA shall "supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan . . . ." 29 U.S.C. § 1144(4). The Supreme Court has repeatedly held that ERISA's preemption clause is to be read broadly, and ERISA preempts both state statutory law and state common law causes of action. Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 44-48 (1987). "A claim 'relates to' an employee benefit plan, in the normal sense of the phrase, if it has a connection with or refers to such a plan." Borisch, 21 F. Supp. 2d at 894 (citing Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 96-97 (1983)).

Several federal courts have addressed similar arguments and held that claims founded in state contract law such as the ones the Estate seeks to pursue are preempted by ERISA. See, e.g., Ford Motor Co. v. Ross, 129 F. Supp. 2d 1070, 1072 (E.D. Mich. 2001); Borisch v. Treat All Metals, Inc., 21 F. Supp. 2d 890, 894 (E.D. Wis. 1998); Lasche, 870 F. Supp. at 339; see also, Boggs v. Boggs, 520 U.S. 833, 843 (1997) (rejecting contention that state testamentary law was not preempted by ERISA because party was simply seeking payment of plan proceeds pursuant to will from surviving spouse after the plan paid proceeds to surviving spouse); Hurwitz, 982 F.2d at 783 (holding that ERISA preempted state equitable claims because such a claim "is merely an attempt to evade the clear statutory requirements" of ERISA."); National Auto. Dealers & Assocs. Retirement Trust, 89 F.3d at 502 (same).

The Estate's state law claims are clearly related to the employee benefit plan. Permitting the Estate to attempt to access the plan benefits by way of the back door of a state common law would

circumvent ERISA's spousal waiver requirements and thus render those provisions meaningless, would conflict with and frustrate ERISA's objectives, and would preclude the uniform implementation of this federal statutory scheme. Therefore, these claims are preempted by ERISA and must fail.

While this court acknowledges the reality of the relationship, of lack thereof, between Alan and Renee Propst at the time of his death, those who want to be sure that their prenuptial intent is not subsequently thwarted by ERISA would be well-advised to invite a notary public or a plan representative to their wedding. Then, immediately following the vows and "You may now kiss the bride," insert, "You may now sign your ERISA waivers." Absent appropriate follow-up after becoming married, any effort to pass assets covered by ERISA to someone other than the surviving spouse will be unsuccessful. Requiring newlyweds to immediately consider the implications and consequences of the words, "'Til death do us part," will most certainly chill the romance of the occasion, but that may have already been accomplished by the execution of the prenuptial agreement. Congress has determined that what is most important is ensuring that a surviving spouse's interests are protected and thus it enacted a system with strict requirements before the parties' contrary intent can be given legal effect.

The formality and care with which a spouse's waiver of rights must be undertaken is not unique to ERISA law. As the Fourth Circuit observed:

> [T]he law is filled with formalities required to ensure a clear record of a party's intent in particular types of transactions. For example, the statute of frauds requires a writing for specified transactions; the law of wills and estates imposes witnessing requirements for wills; and real property law demands a writing and recordation for conveyances of real property. So too, ERISA requires a notarized writing with specific language to waive spousal rights. These are not merely "perfunctory matters." Davis v. Williford, 271 U.S. 484, 488 (1926) (declaring a will invalid because it did not have an attached "certification of acknowledgment" as required by federal statute). As the Supreme Court observed in Davis, legal formalities avoid the uncertainty that would result if subjective evidence of important transactions were permitted. Id. at 487-88.

Hagwood, 282 F.3d at 291-92.

Therefore, for the reasons set forth above, the court finds that despite the antenuptial agreement, Renee Propst is the proper beneficiary of the proceeds of Alan Propst's 401(k) account. The court shall grant her motion for summary judgment.

**PLAINTIFFS' MOTION TO DISMISS AND FOR ATTORNEYS' FEES**

The plaintiffs have filed a motion to be dismissed from this action and a motion for attorneys' fees. (Docket Nos. 43, 44.) Renee Propst, (Docket No. 46), and the Estate defendants (Docket No. 48), have responded, and the plaintiffs have replied, (Docket No. 49).

No defendant has raised any challenge to the propriety of this interpleader action. It is clear that the plaintiffs, as the administrator and fiduciary of the plan, had reason to be concerned that there were two conflicting claims to Alan Propst's 401(k) account. It is further undisputed that the plaintiffs have satisfied their obligation to deposit the disputed funds with the court. Therefore, neither defendant raises an objection to the plaintiffs being dismissed from this action, and thus their motion shall be granted.

The court shall now turn to the issue of attorneys fees. The plaintiffs seek a total of $62,127.00 in attorneys' fees and $6,085.81 in costs. In the affidavit of Charles P. Stevens, an attorney for the plaintiffs from the law firm of Michael Best & Friedrich, LLP, Attorney Stevens divides the action into five distinct segments: (1) the investigation of the competing claims; (2) the commencement of the action; (3) Rule 26 disclosures; (4) responding to Renee Propst's counterclaim; and (5) drafting the motion for dismissal and for attorneys' fees. (Docket No. 44-4.) The defendants each argue that the costs and fees requested are excessive.

> Courts have broad discretion in determining whether to award attorneys fees out of the deposited proceeds. United Bank of Denver v. Oxford Properties, Inc., 683 F. Supp. 755, 756 (D. Colo. 1988). As a general matter, a court will award fees from the proceeds where "(1) the party seeking fees is a disinterested stakeholder, (2) who had conceded liability, (3) has deposited the disputed funds into court, and (4) has

sought a discharge from liability." Septembertide Publ'g v. Stein & Day, Inc., 884 F.2d 675, 683 (2d Cir. 1989). Courts have, however, refused to deduct fees from the proceeds when the stakeholder was in some way culpable with respect to the subject matter of the interpleader proceeding. See, e.g., United Bank of Denver, 683 F. Supp. at 756. In addition to culpable conduct, some courts have also refused to allow fee deduction where the costs of initiating the interpleader action are properly considered part of the stakeholder's cost of doing business. See Chase Manhattan Bank v. Mandalay Shores Coop. Hous. Ass'n (In re Mandalay Shores Coop Hous. Assn'n), 21 F.3d 380, 383 (11th Cir. 1994); Aetna U.S. Healthcare v. Higgs, 962 F. Supp. 1412, 1414 (D. Kan. 1997). This course-of-business exception does not, however, enjoy universal support from the courts. 4 Moore, et al., *Moore's Federal Practice* § 22.06, at 22-104 (3d ed. 2001).

Several considerations justify awarding the plaintiff attorney's fees from the interpleader fund:

> It is thought appropriate to award counsel fees to [a disinterested] stakeholder because the retention of counsel has in all likelihood been necessitated not because of the stakeholder's wrongdoing but rather because he is the mutual target in a dispute which is not of his own making. Moreover, the stakeholder is often viewed as having performed a service to the claimants by initiating a proceeding which will expeditiously resolve their claims and by safeguarding the disputed fund by deposit in court, which at the same time guarantees the prevailing claimant immediate satisfaction without the need for execution proceedings. *Moore's*, at 22-171, 22-173.

United Bank of Denver, 683 F. Supp. at 757 (alteration in the original).

Lutheran Bhd. v. Comyne, 216 F. Supp. 2d 859, 863 (E.D. Wis. 2002).

> The remedy of interpleader should, of course, be a simple, speedy, efficient and economical remedy. Under ordinary circumstances there would be no justification for seriously depleting the fund deposited in court by a stakeholder through the allowance of large fees to his counsel. The institution of a suit in interpleader, including the depositing of the fund in the registry of the court and the procuring of an order of discharge of the stakeholder from further liability, does not usually involve any great amount of skill, labor or responsibility, and, while a completely disinterested stakeholder should not ordinarily be out of pocket for the necessary expenses and attorney's fees incurred by him, the amount allowed for such fees should be modest.

Hunter v. Federal Life Ins. Co., 111 F.2d 551, 557 (8th Cir. 1940); see also, Chase Manhattan Bank, 21 F.3d at 383 ("[F]ees for the stakeholder typically are quite minor and therefore do not greatly diminish the value of the asset.").

The nearly seventy-thousand dollars in costs and fees requested by the law firm of Michael Best & Friedrich, LLP are excessive and unreasonable. This court has been unable to locate any analogous case where a court has awarded anywhere close to the amount in attorneys' fees and costs requested by the plaintiffs in the present case. See, e.g., Rhoades v. Casey, 196 F.3d 592, 603 (5th Cir. 1999) (noting "the award of $23, 951 is a large sum in attorney's fees for an interpleader action."); Septembertide Pub., B.V. v. Stein & Day, Inc., 884 F.2d 675, 683 (2d Cir. 1989) (awarding costs of $1,125.08 and $14,092.00 in attorneys' fees); Lutheran Brotherhood, 261 F. Supp. 2d at 864 (parties agreed that $5,000 was an appropriate amount for the plaintiff's costs and attorneys' fees, and thus the court ordered this amount to be deducted from the deposited proceeds); United Bank of Denver, Nat'l Asso. v. Oxford Properties, Inc., 683 F. Supp. 755, 756 (D. Colo. 1988) (plaintiff requested $15,182.50 in attorney's fees).

The twenty-one page bill submitted by the plaintiffs' attorneys groups together a large number of related actions in a single entry so it is impossible to determine precisely how long was expended on any task, but it is clear that the bill is filled with charges not directly related to their bringing this present action. For example, there are numerous entries relating to research of a "life insurance beneficiary issue." There are also numerous charges that appear to be related to training of an inexperienced new associate that the court finds are inappropriate to deduct from the deposited funds. For example, the billing statements reflect over seven hours in conference between Attorney Stevens and B. Belk regarding the filing of an interpleader action and the drafting of initial documents. And then, Stevens devotes time to checking Belk's work. While it may be beneficial for the law firm to develop and train its associates, it should not be accomplished at the

expense of non-clients. In this same regard, the statement reflects nearly six hours for research of the initial disclosure requirements under the Federal Rules of Civil Procedure.

The court also finds that the plaintiffs are not entitled to recover any expenses incurred in relation to Renee Propst's counterclaim. Although eventually dismissed pursuant to a stipulation of the parties, Renee Propst's counterclaim was not frivolous and the plaintiffs were subject to suit regardless of it bringing this interpleader action. The billing records are not sufficiently detailed to permit this court to determine precisely what amounts relate only to Renee Propst's counterclaim but in light of the fact that an ordinary interpleader action requires minimal involvement and effort by a plaintiff, the court finds it fair to assume that a substantial portion of the expenses incurred were related to Renee Propst's counterclaim.

Similarly, it is clear that many of the attorneys' fees relate to legal expenses incurred by the plaintiffs in performance of their fiduciary duties as plan administrators. It is not appropriate for the court to deduct these costs incurred in the ordinary course of business from the deposited funds. See, e.g., Chase Manhattan Bank, 21 F.3d at 383. Again, the court is unable to determine precisely what amounts relate only to the plaintiffs' ordinary costs of doing business but similarly assumes that a substantial portion of the expenses incurred were unrelated to their having brought this interpleader action.

However, certainly the plaintiffs are entitled to be fairly reimbursed for costs reasonably incurred in bringing this action. Some cursory research into an appropriate plan beneficiary is an ordinary cost of business. But when it is revealed that there is likely going to be a substantive dispute between prospective beneficiaries so as to raise the prospect of the need for an interpleader action, additional research into the facts to prepare a complaint and file an action will be necessary and should be recoverable. According to the billing records submitted, it took the plaintiffs' attorneys only 17.86 hours at a cost of $5,017.50 to conduct sufficient research to prepare a draft of
-16-
Case 2:06-cv-01235-AEG   Filed 12/28/07   Page 16 of 18   Document 60

the interpleader complaint on September 15, 2006. It was more than two months and many thousands of dollars later when the complaint was filed in this action, and the court finds many of these additional costs excessive. The court finds that $7,500 is a reasonable cost for investigating and initiating an action such as this.

Additionally, it is reasonable for the plaintiffs to engage in some degree of discussion with the attorneys for the prospective beneficiaries, but once that complaint is filed, the role of the plaintiffs ordinarily need not be any more than minimal. Although this case did raise somewhat novel questions, the plaintiffs need not concern themselves with expending any effort in trying to decipher these issues. In fact, avoiding involvement in the substantive dispute is precisely the rationale for the plaintiffs to file an interpleader action. In many ways, once the plaintiffs file the action, they can sit back and let the defendants fight it out without incurring anything more than minimal expenses. For example, the plaintiffs may need to participate in some minimal discovery such as responding to certain interrogatories or producing documents. But such requests should be minimally burdensome because the necessary information should have been uncovered as part of the plaintiffs' preliminary investigation. Additionally, despite being minimally involved, it would be prudent for the plaintiffs to keep informed as to the defendants' actions, review all documents filed, participate in status conferences, inform clients of the status of the case, and similar actions. For these actions, the court finds that $5,000 is a reasonable sum.

It is also reasonable to expect that the plaintiffs would incur some expenses related to filing a motion to dismiss them as a party and a motion for attorneys' fees. For these efforts, the court finds it reasonable that the plaintiff would have incurred $1,000 in attorneys' fees. Additionally, the plaintiffs are entitled to be compensated for reasonable costs incurred in bringing this action. For this, the court finds that $1,500 is a reasonable sum.

Therefore, the court shall order the sum of $15,000 to be deducted from the funds deposited with the court and paid to the plaintiffs to compensate them for their reasonable attorneys' fees and costs incurred in bringing this action. The court also finds this amount reasonable in light of the amount at issue. The plaintiffs have deposited roughly $300,000.00 in disputed funds. The court finds it entirely unreasonable to deduct roughly 23% or $70,000 of the disputed funds for the plaintiffs' costs and attorneys' fees. In light of the amount in controversy and the nature and purpose of interpleader actions, the court finds a deduction of roughly 5% from the deposited funds for the plaintiffs' costs and attorneys' fees is reasonable.

**IT IS THEREFORE ORDERED**:

(1). Renee Propst's motion for summary judgment, (Docket No. 40), is **granted**. The disputed funds deposited with the court, excluding the amount for reasonable attorneys' fees and costs, as set forth below, shall be paid to Renee Propst.

(2). The plaintiffs' motion to be dismissed as a party in this action, (Docket No. 43), is **granted**.

(3). The plaintiffs' motions for costs and attorneys' fees, (Docket No. 43), is **granted in the amount of $15,000.00**. The amount of **$15,000.00** shall be deducted from the disputed proceeds deposited with the court and paid to the plaintiffs.

(4). The clerk shall enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 28th day of December 2007.

s/AARON E. GOODSTEIN
U.S. Magistrate Judge